AO 106 (Rev. 04/10)  Application for a Search Warrant

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

# UNITED STATES DISTRICT COURT

for the

Western District of Virginia

JUL - 6 2022

JULIA C. DUDLEY, CLERK
BY: *[signature]*
DEPUTY CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Facebook information in the possession of or under the
control of Meta Platforms Inc., Menlo Park, CA further
described in Attachment A

)
)
)
)
)
)

Case No. 1:22mj65

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See attachment A

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §1040(a); §371 | Fraud in connection with major disaster benefits; Conspiracy to defraud the US |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*[signature]*

*Applicant's signature*

Jeffrey A. Carter, Special Agent, USDOL-OIG

*Printed name and title*

telephonically

Sworn to before me ~~and signed in my presence.~~

Date: 7/6/22

City and state: Abingdon, Virginia

*[signature]*

*Judge's signature*

Pamela Meade Sargent, United States Magistrate Judge

*Printed name and title*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FACEBOOK ACCOUNTS ASSOCIATED WITH FACEBOOK USERNAMES<br><br>**"Danny Mullins Jr." (profile ID 100016950458318); and**<br><br>**"Danny Lee Mullins Jr." (profile ID jbear221972); and**<br><br>**"Rona Mullins" (profile ID 100040591440005)**<br><br>WHICH ARE IN THE POSSESSION OF OR UNDER THE CONTROL OF META PLATFORMS, INC., MENLO PARK, CALIFORNIA 94025 | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jeffrey Carter, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook usernames that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), formerly known as Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information pertaining to stored electronic communications in its possession, pertaining to the subscribers or customers associated with the user IDs identified herein.

2.    I am a Special Agent with the United States Department of Labor, Office of Inspector General ("DOL-OIG") and have been so since August 2001. I am currently assigned to the Roanoke Field Office. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center. I have a Bachelor of Science in Criminal Justice. I have more than 20 years' experience conducting criminal investigations involving matters of fraud, theft, criminal conspiracies, and false statements. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses. While assigned to the Roanoke Field Office, I have conducted criminal investigations of individuals, organizations and businesses related to the Commonwealth of Virginia ("VA") Unemployment Insurance ("UI") Benefit Program and the Pandemic Unemployment Assistance Program ("PUA").

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based upon your affiant's training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371 (Conspiracy to commit an offense against the US or to defraud the US) and 18 U.S.C. § 1040(a) (fraud with

2

respect to major disaster or emergency benefits) have been committed by Danny L. Mullins Jr., Veronica Mullins, and other persons, both known and unknown.[1] There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## BACKGROUND: CARES Act and Pandemic Benefits

5.      This investigation involves a conspiracy to defraud the United States of Pandemic Unemployment Assistance benefits by Danny L. Mullins Jr., Veronica Mullins, Leelynn Danielle Chytka and others, known and unknown.

6.      Unemployment Insurance (UI) is a state-federal program that provides monetary benefits to eligible lawful workers. Although state workforce agencies (SWAs) administer their respective UI programs, they must do so in accordance with federal laws and regulations. UI payments (benefits) are intended to provide temporary financial assistance to lawful workers who are unemployed through no fault of their own. Each state sets its own additional requirements for eligibility, benefit amounts, and length of time benefits can be paid. Generally, UI weekly benefit amounts are based on a percentage of your earnings over a base period. In the Commonwealth of Virginia, the Virginia Employment Commission (VEC) administers the UI program.

---

[1] Both Danny L. Mullins Jr. and Veronica Mullins were indicted by a federal grand jury on April 28, 2021. 1:21-cr-24, ECF No. 25. On April 11, 2022, Veronica Mullins pleaded guilty to conspiring to defraud the United States, in violation of 18 U.S.C. § 371, conspiring to commit mail fraud, in violation of 18 U.S.C. § 1349, and conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k). Veronica Mullins is pending sentencing.

7.      On March 13, 2020, the President of the United States declared the ongoing Coronavirus Disease 2019 ("COVID-19") pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia pursuant to section 501 (b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act").

8.      On March 18, 2020, the President signed the Families First Coronavirus Response Act ("FFCRA") into law. The FFCRA provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. It expanded states' ability to provide UI for many workers impacted by COVID-19, including for workers who are not ordinarily eligible for UI benefits. The CARES Act provided for three new UI programs:  Pandemic Unemployment Assistance ("PUA"); Federal Pandemic Unemployment Compensation ("FPUC"); and Pandemic Emergency Unemployment Compensation ("PEUC").

9.      The first program, PUA, provided for up to 39 weeks of benefits to individuals who were self-employed, seeking part-time employment, or otherwise would not qualify for regular UI or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act. Coverage included individuals who had exhausted all rights to regular UI benefits or extended benefits under state or federal law or PEUC.   Under the PUA provisions of the CARES Act, a person who was a business owner, self-employed worker, independent contractor, or "gig" worker could qualify for PUA benefits administered by VEC if he/she previously performed such work in Virginia and was unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19 related reason. A PUA claimant was required to answer

various questions to establish his/her eligibility for PUA benefits. The claimant was required to provide his/her name, Social Security Number, and mailing address. The claimant was also required to identify a qualifying occupational status and COVID-19 related reason for being out of work. The eligible timeframe to receive PUA was from weeks of unemployment beginning on or after January 27, 2020 through December 31, 2020.

10.     The second program, PEUC, is a state-federal program that provided for up to 13 weeks of benefits to individuals who had exhausted regular UI under state or federal law, had no rights to regular UI under any other state or federal law, were not receiving UI under the UI laws of Canada, and were able to work, available for work, and actively seeking work. Under this program, states were required to offer flexibility in meeting the "actively seeking work" requirement if individuals were unable to search for work because of COVID-19, including because of illness, quarantine, or movement restriction. The eligible timeframe to receive PEUC included weeks of unemployment beginning after the respective state established an agreement with the federal government through December 31, 2020. The earliest being April 5, 2020.

11.     The third program, FPUC, provided individuals who were collecting regular UI, PEUC, PUA, and several other forms of UC with an additional $600 per week. The eligible timeframe to receive FPUC was from weeks of unemployment beginning after the respective state had an established agreement with the federal government through July 31, 2020. The earliest being April 5, 2020.

12.     On August 8, 2020, after FPUC expired, the President signed a Presidential Memorandum authorizing FEMA to use disaster relief funds pursuant to Section 408 of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden

on individuals who were unemployed as a result of COVID-19. The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds. The period of assistance for LWAP was from August 1, 2020 to December 27, 2020.

13.    The PUA, FPUC, and LWAP programs (collectively, "pandemic unemployment benefits") were administered by the various states, including the Commonwealth of Virginia, but their benefits were funded by the federal government. In order to receive pandemic benefits, an applicant had to access a website maintained by the Virginia Employment Commission (VEC) and file a claim.

14.    Individuals were only eligible for pandemic unemployment benefits if they were unemployed for reasons related to the COVID-19 pandemic and were otherwise available to work.

15.    Once an applicant was at the website, the applicant was required to enter personal identifying information including their name, date of birth, social security number, email address, phone number, and physical address. An applicant was then required to answer a series of questions to determine the claimant's eligibility and payment amount.

16.    Upon completion, the application was submitted to the VEC. If approved, the applicant could elect whether to have the pandemic benefits deposited directly into a bank account of their choosing, or request the funds be loaded on a pre-paid debit card which was then shipped to the applicant via United States Postal Service to the address listed on their application.

17.     In or around June 2020, the VEC began reviewing UI and PUA claims to identify fraudulent claims.  By August 2020, VEC officials had learned from other states that inmates in correctional facilities were receiving UI benefits.  Incarcerated individuals are not available for employment so as long as their unemployment was a result of their incarceration and not related to COVID-19, nor are they able to seek full time employment.  These individuals are unemployed due to their own criminal conduct and not due to COVID-19.  For those reasons, they are not eligible to receive UI and PUA benefits.  Consequently, VEC obtained a list of approximately 39,000 inmates housed by the Virginia Department of Corrections ("VADOC") and cross-matched the Virginia UI and PUA claims to people who were shown to be claimants on the inmate list.

18.     This information generated numerous investigations into allegations of fraudulent unemployment claims and schemes to commit fraud.  This investigation ensued.

## PROBABLE CAUSE

19.     This application seeks a search warrant for information detailed in Attachment B as it pertains to the Facebook accounts associated with usernames "Danny Mullins Jr." (profile ID 100016950458318); "Danny Lee Mullins Jr." (profile ID jbear221972); and "Rona Mullins" (profile ID 100040591440005).  To protect against an unreasonable search of private communications, this application is limited to a period of time between May 1, 2020 through the present.

20.     Your affiant's investigation determined the following facts relevant to this application:

a.     Primary co-conspirators Leelynn Danielle Chytka ("Chytka"), Gregory Tackett, and Jeffery Tackett were each interviewed as part of this investigation.  Chytka cooperated

7

extensively with the government, agreeing to be interviewed at least four times, testifying before the grand jury, and testifying at the trial of four co-conspirators. Investigators also interviewed Veronica Mullins during the course of this investigation. On May 3, 2022, after pleading guilty in her case pursuant to a plea agreement, Veronica Mullins, accompanied by her attorney, was debriefed by your affiant. During this interview, Veronica Mullins provided additional details relevant to Danny Mullins Jr.'s involvement in the alleged scheme.

b.   Chytka told investigators that Veronica Mullins is the mother of co-conspirators Jeffery Tackett and Gregory Tackett. According to Chytka, Veronica Mullins learned from Ms. Chytka and Gregory Tackett that she could receive federal money by filing a fraudulent claim for pandemic unemployment benefits in June, 2020. Upon learning this, Veronica Mullins sought to obtain pandemic unemployment benefits even though, as she then well knew, she was not eligible to receive such benefits. Veronica Mullins was not unemployed due to COVID-19.

c.   Both Veronica Mullins and Chytka told investigators that the two communicated frequently using Facebook Messenger. Both Veronica Mullins and Chytka admitted to discussing the fraudulent unemployment claims using Facebook Messenger as well. During the course of this investigation, the government obtained Chytka's Facebook messages via a search warrant approved by this Court. A review of Chtyka's Facebook messages reveals numerous messages pertaining to illicit activity, including the filing of fraudulent unemployment claims and the distribution of drugs. These messages revealed several of Chytka's acquaintances who used multiple Facebook accounts for the same individual. Based upon my training and experience, I know that individuals involved in illicit activity often use different Facebook accounts to reduce the likelihood of detection.

8

d.  Chytka provided the government with screen shots of her Facebook messages with Veronica Mullins indicating that on June 16, 2020, Veronica Mullins sent her personal information to Chytka for the purpose of filing her fraudulent claim. (See below.)  Virginia Employment Commission records show that on June 26, 2020, a claim was filed for Veronica Mullins.

e.  Veronica Mullins admitted to investigators that after receiving her initial unemployment money she approached Chytka about filing additional fraudulent claims for several family members and friends.  On July 1, 2020, Veronica Mullins sent a Facebook Messenger message to Chytka in which she embedded a screen shot of a Facebook message from Danny Mullins Jr..  In this message, Danny Mullins Jr. provided his personal information and confirmation number from when he had previously attempted to file a claim for pandemic unemployment assistance. (See below.)




(These are Screen shots of messages from Chytka's Facebook Messenger app showing communications with Veronica Mullins.  Continued.)



(These are Screen shots of messages from Chytka's Facebook Messenger app showing communications with Veronica Mullins.  Continued.)

21.    Using information provided by Veronica Mullins, Chytka filed fraudulent claims for pandemic unemployment assistance for Danny Mullins Jr. and others.

22.    In her debriefing on May 3, 2022, Veronica Mullins told investigators that during this time period, Veronica Mullins communicated with Danny Mullins Jr. on several occasions about filing for pandemic unemployment benefits.  Veronica Mullins told investigators that Danny Mullins Jr. initially declined to participate in the scheme, telling Veronica Mullins that he

did not want to risk getting a federal charge.  Veronica Mullins told investigators that days later,

Danny Mullins Jr. messaged her saying "fuck it, let's give it a shot", or words to that effect.

23.     On June 2, 2022, Veronica Mullins provided the government with several screen

shots of Facebook Messenger messages between Veronica Mullins and Danny Mullins Jr. in

which they were discussing the filing of pandemic unemployment assistance claims.



(Facebook Messenger screen shots provided by Veronica Mullins.  Continued)



(Facebook Messenger screen shots provided by Veronica Mullins.  Continued)

24.     Open-source intelligence available to your affiant shows both Veronica
Mullins and Danny Mullins Jr. have multiple Facebook accounts.  This application is limited,
however, to the profiles detailed below:

a.     **Profile Name "Danny Lee Mullins Jr." (profile ID jbear221972)** indicates
a Facebook account for a user living in Pound, Virginia.  Indicted co-conspirator Danny
Mullins Jr.'s full legal name is known by your affiant to be Danny Lee Mullins Jr.  Danny
Mullins is known to be from Pound.  Notably, this profile account shows the same profile
photo (a Mullins coat of arms) that appears in the messages between Danny Mullins and
Veronica Mullins above.

12



b.  Profile Name "Danny Mullins Jr." (profile ID 100016950458318) also

indicates a Facebook account for a user living in Pound, Virginia.  The profile picture for this

account is known by your affiant to be Danny Mullins Jr.  Notably, this profile account

shows the same profile photo (a headshot photograph of Danny Mullins Jr.) that appears in

the messages between Danny Mullins and Veronica Mullins that Veronica Mullins embedded

into her messages with Chytka.



c.  Profile Name "Rona Mullins" (profile ID 100040591440005).  A search of

public facing Facebook pages reveals that this profile for Veronica Mullins is no longer

published.  However, certified Facebook records from Chytka's Facebook account identify

the username and Facebook account for Veronica Mullins as "Rona Mullins" (profile ID

100040591440005).  Although these records are displayed in a .pdf format, they indicate the

same Facebook Messenger chat as depicted above.

> **Author** Rona Mullins (Facebook: 100040591440005)
> **Sent** 2020-07-01 03:34:43 UTC
> **Body** Do u hv enough time to file a claim or two
>
> **Author** Danielle Chytka (Facebook: 1531574804)
> **Sent** 2020-07-01 03:58:59 UTC
> **Body** Yeah prob I can make it happen
>
> **Author** Rona Mullins (Facebook: 100040591440005)
> **Sent** 2020-07-01 04:29:10 UTC
> **Body** Sweet. I'll send u their info

25.     This application seeks contents associated with each of these Facebook IDs

between May 1, 2020 and the present.  Because Veronica Mullins pled guilty to obstructing

justice, it is reasonable to believe that either she or other co-conspirators may have had access to

these accounts and may have endeavored to delete evidence of the crime.

## TECHNICAL BACKGROUND

26.     Meta owns and operates a free-access social networking website called Facebook

that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the

general public.

27.     Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter.  This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

14

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

28.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

29.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has

Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

32.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

33.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

16

34.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

17

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

35.     Therefore, Facebook servers are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

36.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

37.     Based on the foregoing, I request this Court issue the proposed search warrant. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that there exists evidence of a crime stored in the electronic files owned and maintained by Meta. Accordingly, a search warrant is requested.

38.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

18

39.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

Jeffrey Carter
Special Agent
United States Department of Labor
Office of Inspector General

Subscribed and sworn to before me on ~~June~~ telephonically _____, 2022
July 6th

UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the **Facebook accounts associated with usernames "Danny Mullins Jr." (profile ID 100016950458318); "Danny Lee Mullins Jr." (profile ID jbear221972); and "Rona Mullins" (profile ID 100040591440005)** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms Inc., a company headquartered in Menlo Park, California.

**To protect against an unreasonable search of private communications, this application is limited to a period of time between May 1, 2020 through the present.**

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. (Meta) and its former entity Facebook, Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities **from May 1, 2020 to present;**

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **from May 1, 2020 to present**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the

groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

     (e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

     (f) All other records and contents of communications and messages made or received by the user **from May 1, 2020 to present**, including all Facebook Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

     (g) All "check ins" and other location information;

     (h) All IP logs, including all records of the IP addresses that logged into the account;

     (i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

     (j) All information about the Facebook pages that the account is or was a "fan" of;

     (k) All past and present lists of friends created by the account;

     (l) All records of Facebook searches performed by the account **from May 1, 2020 to present**;

     (m)All information about the user's access and use of Facebook Marketplace;

     (n) The types of service utilized by the user;

     (o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(r) Meta (Facebook) is hereby ordered to disclose the above information to the government within **14 Days** of issuance of this warrant.

II.     **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 371 (Conspiracy to defraud the United States) and 18 U.S.C. § 1040(a) (fraud in connection with major disaster or emergency benefits), involving Facebook accounts associated with usernames "Danny Mullins Jr." (profile ID 100016950458318); "Danny Lee Mullins Jr." (profile ID jbear221972); and "Rona Mullins" (profile ID 100040591440005) from **May 1, 2020 to present** including information pertaining to the following matters:

(a) Communication among "Danny Mullins Jr." (profile ID 100016950458318), "Danny Lee Mullins Jr." (profile ID jbear221972), "Rona Mullins" (profile ID 100040591440005) and others concerning the filing of claims for pandemic unemployment benefits, including Unemployment Insurance and Pandemic Unemployment Assistance.

(b) Evidence indicating how and when the Facebook accounts were accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner(s);

(c) Evidence indicating the Facebook account owner(s)'s state of mind as it relates to the crime under investigation;

(d) The identity of all persons who created or used the user IDs, including records that help reveal the whereabouts of such person(s).